Filed 4/3/20; Certified for Publication 4/30/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re JONATHAN HAMPTON on Habeas Corpus. | C087151 |
| | (Super. Ct. No. 14HC00477) |
| | OPINION ON TRANSFER |

Jonathan Hampton shot and killed Jonathan Giurbino. In 2009, Hampton was convicted by jury of second degree murder and found to have personally used a firearm during the commission of the offense. We affirmed the judgment entered against him in *People v. Hampton* (Oct. 26, 2010, C061681) [nonpub. opn.] (*Hampton I*).

After an initial round of state and federal habeas corpus litigation resulted in denial of his petitions, Hampton initiated a second round of state habeas corpus litigation in 2014. Hampton asserted for the first time: (1) the trial court prejudicially erred and violated his federal constitutional rights by failing to instruct the jury, sua sponte, with CALCRIM No. 570 on heat of passion voluntary manslaughter; (2) his trial counsel provided constitutionally deficient assistance in failing to request such an instruction; and

1

(3) his appellate counsel provided constitutionally deficient assistance in failing to assert this instructional error claim in his direct appeal. According to Hampton, he was unaware of his entitlement to a heat of passion instruction until July 2014, when another inmate handed him a copy of the First Appellate District's decision in *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*), holding on facts similar to the facts of this case that the trial court's denial of the defendant's request for a heat of passion instruction amounted to federal constitutional error and required reversal.

The trial court granted the petition, concluding the original trial court prejudicially erred in failing to instruct the jury with CALCRIM No. 570, and further concluding the *Thomas, supra,* 218 Cal.App.4th 630 decision amounted to a change in the law entitling Hampton to raise the instructional error claim in his habeas corpus petition despite having failed to do so on appeal. The People appealed. We reversed in *In re Hampton* (Sept. 13, 2017, C081634) [nonpub. opn.] (*Hampton II*), holding, "the trial court erred in determining there was an intervening change of law regarding heat of passion for voluntary manslaughter as it applies to [Hampton's] case." (*Hampton II, supra,* C081634 at p. 1.) We remanded the matter to the trial court for a determination regarding his remaining claims of ineffective assistance of counsel (IAC). (*Hampton II, supra,* C081634.) On remand, the trial court denied the habeas corpus petition as untimely.

The instant habeas corpus petition, filed in this court in May 2018, reasserts these IAC claims. We summarily denied the petition. Our Supreme Court granted review and transferred the matter back to this court with directions to vacate our order denying the petition and to issue an order to show cause as to why Hampton is not entitled to relief on his claim of ineffective assistance of appellate counsel (IAAC). Having done so, and having reviewed the return to the order to show cause, as well as Hampton's traverse

2

thereto, we grant the petition, vacate the judgment of conviction, and remand the matter to the Sacramento County Superior Court for further proceedings.

FACTS

We provide a condensed version of the facts previously recited in our unpublished opinion affirming Hampton's murder conviction.

The morning of February 15, 2007, Giurbino asked a coworker for a ride to meet Hampton, a drug dealer who went by the nickname "J-Bird." Giurbino was 19 years old and planning on traveling to San Diego with his family that day. His mother had given him $350 (three $100 bills and a $50 bill) ahead of the trip. The plan was to buy some marijuana and around 100 Ecstasy pills from Hampton and then sell the pills in San Diego for a profit.

Giurbino met Hampton sometime before 11:00 a.m. Around that time, Hampton and Giurbino pulled into a gas station. Hampton was driving a Toyota Corolla he was borrowing from his brother. Giurbino, who was in the passenger seat, got out to pump gas and then went inside to pay. His image was captured on surveillance video paying the cashier $15 he produced from a wallet.

At around 11:30 a.m., Hampton drove Giurbino to a location on Fordham Way in Sacramento. He then shot the young man in the head during an attempted robbery. Who was attempting to rob whom was disputed at trial. According to Hampton's testimony, recounted in detail below, he shot Giurbino with his own gun during Giurbino's attempt to rob him at gunpoint. According to the prosecution's theory, it was Hampton who was robbing Giurbino when the fatal shot was fired.

Before recounting Hampton's testimony, we note a witness who was cleaning a pool at a neighboring house heard what he thought was a car backfire, followed by a "thump, thump" noise, and then the sounds of an engine roaring and tires "peeling out." As he walked out to the street, he saw a car leaving the area and a young man, Giurbino,

3

lying in the street with a gunshot wound to the head. Another witness was taking a walk on Fordham Way around the same time. He noticed a dark Japanese car pass him very quickly. The driver looked angry. As this witness continued to walk, he saw Giurbino lying in the street with blood coming from his head.

Giurbino was taken to the hospital by ambulance. He died from the gunshot wound to his head. He had no wallet or money on him. A second wallet he owned was found at his home. It contained a $50 bill, fourteen $20 bills, and a piece of paper with the name "J-Bird" and Hampton's phone number on it. Giurbino's mother said the $20 bills were from cashing a check. She did not know if the $100 bills she gave to him had been broken into twenties.

After the shooting, Hampton returned the car he had borrowed from his brother. According to his brother's wife, Hampton looked sweaty, his clothes were dirty, and his hair was messy. Hampton insisted on immediately cleaning the car and took a trash bag and wet towel offered for that purpose. A subsequent forensic examination of the car revealed hair, blood, and human tissue on the car. A shell casing was also found in the car.

After cleaning the car, Hampton called a friend, S., and asked to be picked up. When S. arrived, Hampton gave him a $100 bill to buy something to eat at a fast food restaurant. S. later drove Hampton to Rancho Cordova. A subsequent search of S.'s bedroom uncovered a loaded .380-caliber handgun, although S. claimed Hampton was unaware of its existence. When interviewed by police the day after the shooting, S. claimed Hampton told him nothing about what happened prior to S. picking him up. However, in a later interview, and then at trial, S. claimed Hampton told him something was wrong and a "dude tried to play" him. S. understood this to mean someone tried to rob Hampton.

4

Hampton's girlfriend, R., was also interviewed by police. She said Hampton was with her the day before the shooting and he showed her a handgun he recently bought. After Hampton's arrest, he wrote letters to one of R.'s brothers expressing concern she would testify to seeing him with a gun. Hampton urged the brother to kidnap and "tuct" R. away, even though Giurbino, as Hampton put it, "got smacked with his own banger [gun]."

Following Hampton's arrest, he was interviewed by police and initially denied involvement in the shooting of Giurbino. Hampton eventually admitted shooting Giurbino, but claimed it was in self-defense.

As mentioned, Hampton testified in his own defense at trial. Because his testimony is important to our resolution of the issue raised in this habeas corpus petition, we quote from our previous opinion setting forth his testimony in detail:

"[Hampton] admitted he was a marijuana and Ecstasy user and that he made a living from selling marijuana, powder cocaine and Ecstasy. He admitted his nickname was J-Bird and that he had met Giurbino and offered to sell him drugs.

"[Hampton] testified Giurbino phoned him on February 15. Giurbino wanted to purchase a large quantity of marijuana and Ecstasy. He was in a hurry because he was leaving for San Diego. When [Hampton] told Giurbino that he could not provide the drugs until that evening, Giurbino talked about getting the Ecstasy pills from a friend's connection who lived near Sacramento City College. Giurbino said he could get 100 pills for $400, which was less than the $5 [Hampton] was paying for each Ecstasy pill. [Hampton] agreed to drive Giurbino to get the drugs so that he could purchase some pills too. [Hampton] stopped at a tire store to give [a friend] $50 for tires before picking up Giurbino at a Circle K. [Hampton] then made stops at a gas station, where Giurbino was videotaped, and a fast-food restaurant. Finally, Giurbino directed him to the house of his

5

drug connection. [Hampton] and Giurbino shared a marijuana 'blunt' on the way. Giurbino was fidgety and tense.

"[Hampton] testified that as he pulled into a driveway, stopped, and put the car into park, he felt a gun at his temple and heard the click of a hammer being pulled back. Giurbino said: 'Give me all your fucking money, dog.' Holding the gun in his left hand, Giurbino used his right hand to reach across [Hampton], tap [Hampton's] pockets, and pull out a wad of money from [Hampton's] left pocket. Giurbino opened the passenger door and put his right foot out. As he did so, he looked at [Hampton], pointed the gun at him, and told him to not move. Giurbino then scooted out of the car. Leaning back inside the car, Giurbino reached for his sweater and other belongings while still pointing the gun at [Hampton].

"As Giurbino reached for his sweater, [Hampton] claimed to have acted without thinking. [Hampton] grabbed the gearshift and slammed the car into reverse. The car jerked. Giurbino's hand holding the gun hit the ceiling. The gun bounced off the ceiling and landed in [Hampton's] lap, pointing towards [Hampton's] left hip. [Hampton] continued in reverse, but Giurbino was able to regain his balance and walk with the car down the driveway. It seemed to [Hampton] that Giurbino had a grin on his face and [Hampton] thought he was crazy. [Hampton] stepped on the gas pedal and tried to make a turn out of the driveway onto the street. As [Hampton] braked and reached for the gearshift, [Hampton] saw Giurbino lunge toward him. Giurbino's left hand was holding the top rim of the car and his right hand was reaching inside the car, across the passenger seat and center console to just above [Hampton's] right thigh. Giurbino's eyes were looking in the direction of the gun on [Hampton's] lap. [Hampton] was 'real scared' because he knew the gun was loaded from the clicking sound and that it might accidentally go off if Giurbino touched it. Scared that he would be shot, [Hampton]

6

swooped up the gun to prevent Giurbino from reaching it. [Hampton] swung his arm out towards Giurbino. The gun went off. [Hampton] saw Giurbino's head open up.

"[Hampton] testified he never consciously thought of trying to shoot Giurbino and when the gun went off, he was stunned. [Hampton] did not actually see Giurbino fall out of the car. [Hampton] did not look back; he just drove off. [Hampton] saw blood inside the car and thought there was probably blood on the outside of the car. [Hampton] panicked and threw the gun out of the passenger window as he was driving on the freeway. He drove the car back to his brother's house.

"At his brother's house, [Hampton] decided to clean the car. He gathered up Giurbino's sweater, wallet and cell phone, along with the money Giurbino had taken out of [Hampton's] pocket, and put them in a garbage bag. [Hampton] went to the carwash where he disposed of the garbage bag and washed and vacuumed the car. He called [S.] and asked him to meet him at a supermarket parking lot. When he met up with [S.], [S.] was hungry. [Hampton] dipped into his pocket and ended up giving [S.] a $100 bill for food." (*Hampton I*, *supra*, C061681.)

DISCUSSION

I

*General Principles Governing Habeas Corpus Relief*

"The right to habeas corpus is guaranteed by the state Constitution and 'may not be suspended unless required by public safety in cases of rebellion or invasion.' (Cal. Const., art. I, § 11.) Frequently used to challenge criminal convictions already affirmed on appeal, the writ of habeas corpus permits a person deprived of his or her freedom, such as a prisoner, to bring before a court evidence from outside the trial or appellate record, and often represents a prisoner's last chance to obtain judicial review. . . . 'Historically, habeas corpus provided an avenue of relief for only those criminal defendants confined by a judgment of a court that lacked fundamental jurisdiction, that is,

7

jurisdiction over the person or subject matter' [citation], but that view has evolved in modern times and habeas corpus now 'permit[s] judicial inquiry into a variety of constitutional and jurisdictional issues' [citation]. 'Despite the substantive and procedural protections afforded those accused of committing crimes, the basic charters governing our society wisely hold open a final possibility for prisoners to prove their convictions were obtained unjustly. [Citations.] A writ of "[h]abeas corpus may thus provide an avenue of relief to those unjustly incarcerated when the normal method of relief—i.e., direct appeal—is inadequate." ' [Citations.]" (*In re Reno* (2012) 55 Cal.4th 428, 449-450 (*Reno*).)

Notwithstanding "the importance of the 'Great Writ,' " our Supreme Court has established procedural rules limiting its use. (*In re Clark* (1993) 5 Cal.4th 750, 763-764, superseded by statute on other grounds as stated in *Briggs v. Brown* (2017) 3 Cal.5th 808.) One such rule "has come to be known as the *Waltreus*[1] rule; that is, legal claims that have previously been raised and rejected on direct appeal ordinarily cannot be reraised in a collateral attack by filing a petition for a writ of habeas corpus." (*Reno*, *supra*, 55 Cal.4th at p. 476.) This rule is "consistent with the very nature of habeas corpus" as "an extraordinary remedy applicable when the usual channels for vindicating rights—trial and appeal—have failed." (*Id.* at p. 477.) And because "habeas corpus cannot serve as a substitute for an appeal, . . . in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (*In re Dixon* (1953) 41 Cal.2d 756, 759 (*Dixon*).) This has come to be known as the *Dixon* rule.

---

**1**      *In re Waltreus* (1965) 62 Cal.2d 218.

Adjunctive to the *Waltreus, supra,* 62 Cal.2d 218 and *Dixon, supra,* 41 Cal.2d 756 rules, our Supreme Court has also "refused to consider newly presented grounds for relief which were known to the petitioner at the time of a prior collateral attack on the judgment" or "with due diligence should have been known to the petitioner and presented in an earlier petition." (*In re Clark*, *supra*, 5 Cal.4th at pp. 767-768.) "These procedural bars to habeas corpus relief have been termed 'discretionary,' however [citations], and have been described as a 'policy' of the court." (*Id*. at p. 768.) As our Supreme Court explained: "A successive petition presenting additional claims that could have been presented in an earlier attack on the judgment is, of necessity, a delayed petition." (*Id*. at p. 770.) Before considering the merits of such a petition, a court must "ask whether the failure to present the claims underlying the new petition in a prior petition has been adequately explained, and whether that explanation justifies the piecemeal presentation of the petitioner's claims." (*Id*. at p. 774.)

With these general principles in mind, we now turn to the arguments raised in support of and in opposition to Hampton's IAAC claim, raised for the first time in his second state habeas corpus petition.

## II

### *Hampton's IAAC Claim is Not Procedurally Barred*

As we held in *Hampton II, supra,* C081634, Hampton's instructional error claim was barred by the *Dixon* rule, noted above. (*Dixon, supra,* 41 Cal.2d 756.) The same cannot be said of his IAAC claim. For obvious reasons, such a claim could not have been raised on appeal. As our Supreme Court has observed, where a claim was available on direct appeal, but not raised due to ineffective assistance of appellate counsel, such a claim is "cognizable in a postappeal habeas corpus petition under the ineffective counsel rubric." (*In re Harris* (1993) 5 Cal.4th 813, 834; see also *In re Banks* (1971) 4 Cal.3d 337, 343; *In re Spears* (1984) 157 Cal.App.3d 1203, 1208 ["habeas corpus is the

9

appropriate means to remedy deprivation of the effective assistance of appellate counsel"].)

However, this observation does not dispose of the Attorney General's arguments that the claim should be barred both as untimely and as having been raised in a successive petition without adequate justification for either the delay or the failure to raise the claim in Hampton's initial habeas corpus petition. In that regard, we note nearly four years elapsed between the time we issued our opinion affirming Hampton's convictions and the time he filed the instant habeas corpus petition. In the meantime, he filed an initial state habeas corpus petition without raising this IAAC claim.[2] While we agree with the Attorney General that Hampton must adequately explain the delay and that explanation must justify the piecemeal presentation of the IAAC claim (see *In re Clark*, *supra*, 5 Cal.4th at p. 774), we disagree with the Attorney General's conclusion that Hampton has not done so.

In a declaration, Hampton provided the following explanation for the delay: "I, Jonathan Hampton, never knew of, nor was I ever consulted by my trial attorney or any other counsel for that matter, concerning the empowering effect of CALCRIM [No.] 570. I never knew it existed and I certainly did not know that it negates the element of malice. [¶] In July of 2014 as I was housed in a medical unit in Calipatria State Prison a prisoner handed me the 11 page printed copy of [*Thomas*, *supra*, 218 Cal.App.4th 630] and I subsequently filed my petition for writ of habeas corpus in [the Sacramento County Superior Court] seeking relief by way of [IAC] because I felt and currently feel had the jury been provided the instruction they would [have] addressed the element of malice

---

[2]     As we noted in *Hampton II*, *supra*, C081634: "The record does not contain a copy of the prior habeas corpus petition" and "reveals little more than the prior state habeas corpus petition claimed 'insufficiency of evidence to support a verdict.' "

10

through the aegis of CALCRIM [No.] 570, resulting in a different verdict." After providing his understanding of the *Thomas* decision, Hampton stated: "I declare under penalty of perjury that for the first time in my life, in July of 2014 the information provided in [*Thomas*] offered in support of my habeas claims was first obtained. (*Thomas* published January 2014)." Hampton concluded: "Also the lack of funds to hire private counsel, and inadequate experience in research and navigating my way throughout the habeas corpus procedural ladders and prison legal resources hindered me from effectively raising issues in my initial petition for writ of habeas corpus."

In arguing these reasons are inadequate, the Attorney General relies on *In re Clark*, *supra*, 5 Cal.4th 750. There, our Supreme Court set forth the following procedure for determining whether or not to consider a delayed and/or successive petition: "Before considering the merits of a second or successive petition, a California court will first ask whether the failure to present the claims underlying the new petition in a prior petition has been adequately explained, and whether that explanation justifies the piecemeal presentation of the petitioner's claims. This requirement is reasonable in view of the interest of the state in carrying out its judgments, the interest of the respondent in having the ability to respond to the petition and to retry the case should the judgment be invalidated, and the burden on the judicial system." (*Id*. at pp. 774-775.) The court continued: "In assessing a petitioner's explanation and justification for delayed presentations of claims in the future, the court will also consider whether the facts on which the claim is based, although only recently discovered, could and should have been discovered earlier. A petitioner will be expected to demonstrate due diligence in pursuing potential claims. If a petitioner had reason to suspect that a basis for habeas corpus relief was available, but did nothing to promptly confirm those suspicions, that failure must be justified. [¶] However, where the factual basis for a claim was unknown to the petitioner and he [or she] had no reason to believe that the claim might be made, or

11

where the petitioner was unable to present his [or her] claim, the court will continue to consider the merits of the claim if asserted as promptly as reasonably possible. And, as in the past, claims which are based on a change in the law which is retroactively applicable to final judgments will be considered if promptly asserted and if application of the former rule is shown to have been prejudicial." (*Id*. at p. 775.)

Here, we must first distinguish between Hampton's underlying instructional error claim and his derivative IAAC claim. The facts underlying the instructional error claim, i.e., those supporting instruction on heat of passion voluntary manslaughter, are the same facts Hampton relied on at trial to support instructing the jury on imperfect self-defense. He did not suddenly learn of those facts in July 2014 when he was handed the *Thomas* decision while in prison. And because *Thomas, supra,* 218 Cal.App.4th 630 did not change the law of heat of passion manslaughter as it applied to Hampton's case, that decision does not trigger the exception for changes in the law noted above. Thus, there is no adequate justification for bringing *that claim* nearly four years after Hampton's appeal.

However, the key fact underlying the IAAC claim is that Hampton's appellate counsel unreasonably failed to raise the instructional error claim in his appeal. Hampton was entitled to rely on his appellate counsel's judgment concerning what claims to raise on appeal. (See *In re Clark*, *supra*, 5 Cal.4th at pp. 779-780.) But, as we explain below, Hampton was also entitled to an instruction on heat of passion voluntary manslaughter and his appellate counsel's failure to raise this issue on appeal fell below an objective standard of reasonableness and resulted in prejudice. Hampton remained unaware of his entitlement to such an instruction until July 2014, as outlined in his declaration, and then promptly filed the instant habeas corpus petition the following month. Hampton also explained in his declaration that "the lack of funds to hire private counsel, and inadequate experience in research and navigating . . . the habeas corpus procedural ladders and

12

prison legal resources" prevented him from identifying the issue in his initial state habeas corpus petition.

Similar reasons have been held to justify a delay of 18 months. (*In re Spears*, *supra*, 157 Cal.App.3d at p. 1208 ["petitioner has adequately explained this delay as attributable to his lack of capacity to represent himself . . . and the scarcity of channels through which legal assistance is available to indigent prisoners"].) A delay of five years has also been excused based on the petitioner's lack of education and unfamiliarity with the law where the petitioner, upon learning of the applicable law (i.e., the doctrine of diminished capacity) immediately sought the assistance of counsel to review certain medical records relevant to that issue. (*In re Saunders* (1970) 2 Cal.3d 1033, 1040-1041; see also *In re Perez* (1966) 65 Cal.2d 224, 228 [delay of almost three years excused because of petitioner's lack of education and unfamiliarity with the law where petitioner made diligent use of limited opportunities available to prisoners for legal research and preparation of legal documents].)

We conclude Hampton has adequately demonstrated he was not aware of his appellate counsel's failure to raise a meritorious claim on appeal and did not have reason to believe he had a viable claim of IAAC until he discovered the *Thomas* decision, at which point he promptly filed the instant habeas corpus petition. We shall therefore consider this delayed and successive petition on the merits.

### III

### *Merits of the IAAC Claim*

Hampton contends his appellate counsel provided constitutionally deficient assistance by failing to assert on appeal the trial court's failure to instruct the jury with CALCRIM No. 570 on heat of passion voluntary manslaughter. We agree.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California

13

Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris, supra,* 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).)

Appellate counsel does not provide deficient, i.e., objectively unreasonable, assistance by failing to raise every nonfrivolous claim on appeal. (*Smith v. Robbins* (2000) 528 U.S. 259, 288 [145 L.Ed.2d 756].) As the high court has stated: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." (*Jones v. Barnes* (1983) 463 U.S. 745, 751-752.) However, where appellate counsel fails to raise "a significant and obvious issue," the failure will generally be considered deficient performance under *Strickland, supra,* 466 U.S. 668 if the missed issue is "clearly stronger than those presented." (*Gray v. Greer* (7th Cir. 1985) 800 F.2d 644, 646 (*Gray*), quoted with approval in *Smith v. Robbins*, *supra*, 528 U.S. at p. 288.) And where "an issue which was not raised may have resulted in a reversal of the

conviction, or an order for a new trial, the failure [is] prejudicial." (*Gray v. Greer, supra,* at p. 646.)

Thus, in determining whether Hampton's appellate counsel's failure to raise the instructional error claim on appeal fell below an objective standard of reasonableness, and if so, whether the failure resulted in prejudice, we must assess the merits of that claim.

In that regard, *Thomas*, *supra*, 218 Cal.App.4th 630 is instructive. There, the defendant (Thomas) shot and killed the victim (Navarro) after a dispute over parking at Thomas's apartment complex became heated and escalated into a physical confrontation between Thomas and Navarro's friend (Ignacio). Based on the prosecution's evidence, Thomas lost the fight, retrieved a gun from his car, and yelled for his father, who came out see what was going on. At Navarro's request, Thomas's father went over to talk to his son, after which Navarro went over and chastised Thomas for his behavior, prompting Thomas to say, "I'm going to get this motherfucker," before shooting Navarro in the chest. (*Id.* at pp. 634-636, 640.) According to Thomas's testimony, however, a much different dispute over parking resulted in him being attacked by Ignacio and another man, Ignacio's brother. Outnumbered, Thomas tried to get away, but was hit from behind (possibly by Navarro) and kicked while on the ground. Ignacio pulled Thomas to his car and told him to move it. Thomas retrieved the gun and pointed it at Ignacio, who ran over to Navarro and his brother. Thomas, who had been calling for his father's assistance throughout the altercation, continued to do so. After Thomas's father came out, Navarro came over to Thomas and became aggressive. Thomas told Navarro to leave him alone. Navarro "lunged toward him, reaching out with one hand." Thomas pulled the trigger believing Navarro was reaching for the gun. Thomas claimed he made no conscious decision to fire. He did so because he was "afraid" and "nervous" and "just wasn't thinking clearly." (*Id.* at pp. 637-640.)

15

The Court of Appeal held the trial court prejudicially erred in denying Thomas's request to instruct the jury on heat of passion voluntary manslaughter. After noting heat of passion " 'is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation' " (*Thomas*, *supra*, 218 Cal.App.4th at p. 642, quoting *People v. Beltran* (2013) 56 Cal.4th 935, 942), the court concluded there was sufficient evidence from which a reasonable jury could have determined Thomas was in such a state of mind when he pulled the trigger. The court explained: "All the witnesses agree that minutes before he killed Navarro, Thomas had been involved in an argument and physical altercation with the Ortiz brothers and Navarro. Ignacio Ortiz described the argument as 'pretty heated,' and another witness characterized the event leading up to the shooting as a tussle and commotion. The Ortiz brothers and Navarro got the better of Thomas, and various accounts have him crying, calling out for his father or being dragged across the apartment parking lot. Shortly before the shooting, Thomas was seen pacing in the parking lot and he seemed angry. Once he retrieved the assault weapon from his car, his father was trying to calm him down. That is when Navarro approached. Thomas says Navarro lunged at him, and he pulled the trigger. Thomas thought Navarro was going for the gun, and said he did not intend to fire. He fired because he was afraid, nervous and not thinking clearly. Although these facts may fit more precisely with a homicide mitigated by imperfect self-defense, we cannot rule out that they may also show that Thomas was guilty only of voluntary manslaughter because when he shot Navarro his passion was aroused and his reason was obscured due to a sudden quarrel. [Citation.]" (*Thomas,* at p. 645.) The court concluded: "In light of the evidence, the obvious deficiency in the instructions given by the court is that they are bereft of any indication that the jury could consider Thomas's emotional excitement as a factor that could reduce his criminal culpability. The jury should have been instructed under CALCRIM [No.] 570 that a

16

killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone due to a sudden quarrel or heat of passion." (*Id*. at pp. 645-646.)

Similarly, in *People v. Millbrook* (2014) 222 Cal.App.4th 1122 (*Millbrook*), the Court of Appeal held the trial court prejudicially erred in failing, sua sponte, to instruct the jury on heat of passion attempted voluntary manslaughter where the defendant testified "he was 'scared' and 'panicking' " when he shot the victim at a party, and he did so after the victim insulted his girlfriend and "clenched his fists and 'lunged' at [him]." (*Id*. at pp. 1139-1140.) As in this case, the defendant relied on perfect and imperfect self-defense at trial and did not request instruction on heat of passion. (*Id*. at p. 1136.) The appellate court first noted the trial court's sua sponte duty to instruct on all lesser included offenses supported by the evidence regardless of whether the specific theory is relied on by the defense. (*Id*. at p. 1137.) The court also explained that instruction on heat of passion ordinarily supplements instruction on perfect and imperfect self-defense. (*Id*. at p. 1138.) Without recounting all of the evidence supportive of an instruction on heat of passion, we note the court concluded that although the jury rejected the defendant's perfect and imperfect self-defense claims, indicating their view the defendant "did not have an actual fear that he was in imminent danger of death or great bodily injury[,] . . . the jury could nonetheless have found [the defendant] was acting under the actual influence of extreme emotion." (*Id*. at p. 1139.) And while heat of passion voluntary manslaughter also requires the defendant's extreme emotion to have been caused by "adequate provocation," i.e., circumstances sufficient to arouse the passions of the ordinarily reasonable person, that question is ordinarily a question of fact for the jury. (*Id*. at p. 1140.) The court concluded, "the provocation shown here is not so slight that we can conclude, as a matter of law, that a reasonable jury would have been unable to

17

find [the defendant] acted upon a sudden quarrel or in the heat of passion." (*Id.* at p. 1141.)

Here, as in *Millbrook, supra,* 222 Cal.App.4th 1122, Hampton did not request instruction on heat of passion at trial. Thus, the question on appeal would have been whether or not the trial court had a sua sponte duty to provide the instruction. We conclude it did. In assessing the sufficiency of the evidence to support the instruction, "we view the evidence in the light most favorable to the defendant." (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1137.) "For the duty to instruct on a lesser included offense to arise, there must be ' "substantial evidence" [citation], " 'which, if accepted . . . , would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser." ' [Citation.] Evidence is substantial if 'a reasonable jury could find [it] persuasive.' [Citation.] 'In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury.' [Citation.] '[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself' [citation] and 'even when as a matter of trial tactics a defendant . . . fails to request the instruction.' [Citations.] In particular, even if the defendant testifies to a state of mind inconsistent with the theory of a lesser included offense, substantial evidence may still support an instruction on that offense. [Citation.]" (*Id.* at pp. 1137-1138, fn. omitted.)

Hampton testified that he drove Giurbino to a location for the ostensible purpose of buying drugs. When they got there, Hampton pulled into a driveway and put the car in park. While the car was still running, Giurbino put a gun to Hampton's head and demanded money. He then pulled a wad of money from Hampton's pocket and started to get out of the car. As he did so, while still pointing the gun at Hampton, Giurbino reached for his sweater and other belongings that were still in the car. Hampton, without thinking, slammed the car into reverse, causing the car to jerk and

18

knocking the gun out of Giurbino's hand and into Hampton's lap. As Hampton's car reversed down the driveway, Giurbino walked with it. He seemed to have a grin on his face. Hampton then stepped on the gas pedal and tried to make a turn out of the driveway onto the street. As he braked and reached for the gearshift, Giurbino lunged toward him, reaching inside the car while looking in the direction of the gun on Hampton's lap. Scared that he would be shot, Hampton grabbed the gun, swung his arm out towards Giurbino, and fired. He did so without conscious thought and was stunned when the gun discharged. As in both *Thomas, supra,* 218 Cal.App.4th 630 and *Millbrook, supra,* 222 Cal.App.4th 1122, according to Hampton's testimony, he fired as the victim lunged at him and did so without thinking because he was scared. While Hampton relied on perfect and imperfect self-defense at trial, even if the jury did not believe he either reasonably or unreasonably believed he needed to shoot Giurbino in order to defend himself from imminent harm, as they apparently concluded in rejecting these theories, the jury could nevertheless have concluded he fired in the heat of passion, i.e., not out of rational thought but out of unconsidered reaction to the provocation of being robbed at gunpoint by Giurbino. The trial court had a sua sponte duty to instruct on heat of passion voluntary manslaughter.

Turning to the question of prejudice, in *Thomas, supra,* 218 Cal.App.4th 630, the court applied the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*). Noting our Supreme Court has held, "failure to instruct sua sponte on voluntary manslaughter as a lesser necessarily included offense is reviewed under [*People v. Watson* (1956) 46 Cal.2d 818] because, primarily, '[t]he sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone[]' " (*Thomas*, *supra*, 218 Cal.App.4th at p. 644, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*)), the court held the *Chapman* standard applied because *Thomas* involved "not the sua sponte duty to instruct

19

at issue in *Breverman*," but rather the trial court's refusal of a requested instruction on a theory negating an element of the charged offense. (*Thomas, supra,* at p. 644.) The court explained: "Heat of passion manslaughter is a lesser included offense of murder, facts permitting, *because it negates the element of malice.* [Citation.] If provocation is properly presented in a murder case, then, proving the element of malice requires the People to prove the absence of provocation beyond a reasonable doubt. [Citation.] '[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution.' [Citation.] Failure to instruct the jury on heat of passion to negate malice is federal constitutional error requiring analysis for prejudice under *Chapman*." (*Ibid*.)

Here, however, Hampton did not request a heat of passion instruction. Thus, *Breverman, supra,* 19 Cal.4th 142 is the more analogous−and binding−authority on the question of prejudice.[3] Moreover, we have already determined, in *Hampton II, supra,* C081634, that *Thomas, supra,* 218 Cal.App.4th 630 "did not create a new rule of law regarding the standard for assessing prejudice when, as here, the trial court fails to instruct sua sponte on a lesser included offense in a noncapital case." (*Hampton II*, *supra*, C081634.) Accordingly, we continue to apply the *Watson* standard, under which an error is harmless if there is no reasonable probability the verdict was affected. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) In this context, reasonable probability " 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract*

---

[3]    *Millbrook* did not determine whether the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818) continues to apply in this situation, concluding the instructional error was prejudicial "even under the less stringent *Watson* standard." (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1146.)

*possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, italics added; *People v. Wilkins* (2013) 56 Cal.4th 333, 351.)

Returning to *Millbrook*, the court held the failure to instruct on heat of passion in that case was prejudicial under this standard, explaining: "The evidence conflicted as to what prompted [the defendant] to shoot [the victim] and what his state of mind was when he fired the shot. While there was little evidence that [the victim] had a gun or that [the defendant] acted in self-defense, the jury could not agree that the shooting was willful, deliberate, and premeditated. Keeping in mind the evidence favorable to [the defendant], including the evidence that [the victim] provoked their quarrel and that [the defendant] spontaneously shot him, we conclude that there is more than an abstract possibility that the jury would have found [the defendant] guilty of the lesser included offense of attempted voluntary manslaughter if it had been given a heat-of-passion instruction." (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1147.)

We reach the same conclusion in this case. The jury acquitted Hampton of first degree murder and found him guilty of second degree murder. From that, we can infer the jury could not conclude beyond a reasonable doubt Hampton was attempting to rob Giurbino when he shot him in the head, or that Hampton fired the fatal shot with premeditation and deliberation. However, nor was the jury able to conclude Hampton shot Giurbino in the actual (whether reasonable or unreasonable) belief he needed to do so to defend against imminent harm. Thus, how much of Hampton's testimony the jury believed is unclear. There is at least a reasonable possibility the jury believed enough of Hampton's testimony to conclude that while he did not kill Giurbino in self-defense, either perfect or imperfect, his judgment was so obscured by intense emotion that he fired the gun without thinking, acting from passion rather than judgment.

Finally, having determined the omitted instructional error claim had merit and the error resulted in prejudice, we further conclude Hampton's appellate counsel's failure to

21

raise the claim on appeal fell below an objective standard of reasonableness and likewise resulted in prejudice. (*Gray*, *supra*, 800 F.2d at p. 646 [where "an issue which was not raised may have resulted in a reversal of the conviction, or an order for a new trial, the failure [is] prejudicial"].)

## DISPOSITION

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated and the matter is remanded to the Sacramento County Superior Court. The People may retry Jonathan Hampton for second degree murder, should they so elect, within the time specified in Penal Code section 1382, subdivision (a)(2).

The Clerk of this court is directed to forward a copy of this opinion to the California State Bar upon the issuance of the remittitur. (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)


/s/
HOCH, J.


We concur:


/s/
ROBIE, Acting P. J.


/s/
KRAUSE, J.

22

Filed 4/30/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re JONATHAN HAMPTON on Habeas Corpus. | C087151<br><br>(Super. Ct. No. 14HC00477)<br><br>ORDER GRANTING PETITIONER'S REQUEST TO PUBLISH OPINION<br><br>[NO CHANGE IN JUDGMENT] |

ORIGINAL PROCEEDINGS. Writ of habeas corpus. Petition granted. Curtis M. Fiorini, Judge.

Jonathan Hampton, in propria persona, and Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein, Supervising Deputy Attorney General, Keith P. Sager, Deputy Attorney General, for Respondent.

BY THE COURT:

The opinion in the above-entitled matter filed on April 3, 2020 was not certified for publication in the Official Reports. For good cause it now appears the opinion should

1

be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____/s/_____
ROBIE, Acting P. J.

_____/s/_____
HOCH, J.

_____/s/_____
KRAUSE, J.

2